IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| Matthew George Hinkley,<br><br>Plaintiff,<br><br>v.<br><br>Salt Lake City Corporation; and Officer Conrad Leong, in his individual capacity; Officer Jacob McLelland, in his individual capacity; Officer Chad Smith, in his individual capacity; Officer Nickolas Pearce, in his individual capacity; Officer Jason Simpson, in his individual capacity; Officer Wilson Silva, in his individual capacity; and Officer Moeilealoalo Tafisi, in his individual capacity,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>FOR PUBLICATION<br><br>Case No. 2:18-cv-00135-HCN-PMW<br><br>Howard C. Nielson, Jr.<br>United States District Judge |

Plaintiff Matthew George Hinkley has sued Salt Lake City Corporation and seven of its police officers, seeking damages pursuant to 42 U.S.C. § 1983. Mr. Hinkley contends that the police officers violated his rights under the Fourth Amendment of the Constitution by using excessive force against him during an arrest and that both the officers and Salt Lake City are liable for the violation. Defendants have moved for summary judgment, arguing that the officers did not violate Mr. Hinkley's Fourth Amendment rights and are entitled to qualified immunity and that the City cannot be held liable absent any constitutional violation by the officers. For the following reasons, the court grants the motion for summary judgment.

## I.

On November 30, 2016, Mr. Hinkley spent the afternoon at his friend's house, drinking beer and taking cocaine. *See* Dkt. No. 19 ("MSJ") at 1.[1] In the evening, Mr. Hinkley attempted to break into a Salt Lake City barbershop, "using brass knuckles to break the locking mechanism on the front door." Dkt. No. 2 ("Compl.") at 6 ¶ 19; *see also* Dkt. No. 20-6 at 3 (correcting the date of the incident). Multiple officers were dispatched to the scene after a citizen called 911. *See* MSJ at 3 ¶ 2.

Officer Leong was the first to arrive. *See* MSJ at 3 ¶ 3; Compl. at 7 ¶ 23. When he told Mr. Hinkley to keep his hands out of his pockets, Mr. Hinkley refused. *See* MSJ at 4 ¶ 7; Compl. at 7 ¶ 24. Instead, Mr. Hinkley approached Officer Leong, attempted to hit him with his brass-knuckled fist, and then began to run away. *See* MSJ at 4–5 ¶¶ 12–13; Compl. at 7 ¶¶ 25–26.

At about this time, Officers Silva and McLelland arrived on scene and helped Officer Leong chase Mr. Hinkley. *See* MSJ at 5–6 ¶¶ 14–23; Compl. at 8 ¶ 28. During the chase, Officer Leong deployed his taser after warning Mr. Hinkley that he would do so. *See* MSJ at 6 ¶¶ 21–22; Compl. at 7 ¶ 26. "The taser appeared to be ineffective and did not have the usual and expected effect of temporarily locking up Mr. Hinkley's body and preventing any further movement." MSJ at 6 ¶ 23. Mr. Hinkley nevertheless tripped over a bush, fell to the ground, and began flailing and kicking at the three officers with his arms and legs to prevent them from restraining

---

[1] In recounting the events giving rise to Mr. Hinkley's claim, the court relies on the description of these events in the Complaint and Plaintiff's response to the motion for summary judgment as well as those portions of Defendants' description of these events that Mr. Hinkley has not disputed. *See* Dkt. No. 25 ("Resp.") at 3 ("Mr. Hinkley does not dispute the facts leading up to the point during the incident at issue just before the Defendant Officers placed Mr. Hinkley's left hand in handcuffs."). The court does not, however, credit factual assertions that are "utterly discredited" by the video evidence available to the court, *Scott v. Harris*, 550 U.S. 372, 379–81 (2007), including the body camera evidence of Defendant Officers Leong (Dkt. No. 20-4), Silva (Dkt. No. 20-5), Simpson (Dkt. No. 20-33), and Smith (Dkt. No. 20-35).

him. *See* MSJ at 6 ¶¶ 24–25; Compl. at 7 ¶¶ 26–27. Officer Leong again deployed his taser in drive stun mode as a method of pain compliance. *See* MSJ at 6–7 ¶ 28 & n.42.

Despite the taser and the officers' other attempts to restrain him, Mr. Hinkley was able to get back up, continue to flail his arms at the officers, and then attempt to flee again. *See* MSJ at 7 ¶ 30. Officer Leong tried to tackle Mr. Hinkley, and Officer Silva used his taser in drive stun mode. *See id.* at 7 ¶ 31. After both Mr. Hinkley and Officer Leong fell to the ground, Mr. Hinkley got on top of Officer Leong and again tried to hit him with his brass-knuckled fist. *See id.* at 8 ¶¶ 32–33. Officer Leong was able to avoid being hit by hitting Mr. Hinkley in the face with the butt of his taser. *See id.* at 8 ¶ 34. Officer McLelland hit Mr. Hinkley in the upper back or shoulder area with his baton, knocking Mr. Hinkley off of Officer Leong. *See id.* at 8 ¶¶ 35–36. Throughout this encounter, the officers repeatedly commanded Mr. Hinkley to stop resisting and to get on the ground. *See id.* at 6, 8–9 ¶¶ 26, 38.

Mr. Hinkley was now on the ground, and the officers began a struggle to put handcuffs on him, successfully securing his left wrist first. *See id.* at 9 ¶ 39; Resp. at 4. This is the point at which Mr. Hinkley begins to dispute the facts as presented by Defendants in their motion for summary judgment. *See* Resp. at 4 (disputing "the extent [MSJ at 9 ¶ 39] suggests that Mr. Hinkley was resisting the Defendant Officers' effort to place him in handcuffs once they had him on the ground"). According to Mr. Hinkley, for instance, although "[a]n Officer can be heard saying 'stop resisting'" on Officer Silva's body camera, "the video does not show that Mr. Hinkley is struggling at all" as the officers sought to put Mr. Hinkley in the right handcuff. Resp. at 4 (citing Dkt. No. 20-5 at 1:45–2:42).

The court cannot, however, accept facts that are belied by the video evidence. For as the Supreme Court has explained, "[w]hen opposing parties tell two different stories, one of which is

3

blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *see also infra* Part II. It is clear from Officer Silva's body camera that Mr. Hinkley continually resisted the officers' attempt to handcuff both of his wrists by refusing to roll onto his stomach, twisting his body, and refusing to put his arms behind his back. *See* Dkt. No. 20-5 at 1:45–3:45; *compare* MSJ at 9–11 ¶¶ 39–52, *with* Resp. at 4–12 (repeatedly asserting that Mr. Hinkley "was unable to do anything," that he "was not actively resisting the Defendant Officers' attempts to roll him over," and other similar claims).[2]

As they struggled to put on the right handcuff, the officers struck Mr. Hinkley several times and made other efforts to forcibly restrain him. *See* Resp. at 7–9; Dkt. No. 20-5 at 1:50–3:35. Specifically, Officer Leong struck Mr. Hinkley's right arm with his fists several times. *See* MSJ at 9 ¶ 44; Resp. at 7. Officer Tafisi, who arrived around this time to provide backup, joined in the effort to handcuff Mr. Hinkley by punching Mr. Hinkley's left arm several times with his fists after yelling at Mr. Hinkley to put his hands behind his back. *See* MSJ at 10 ¶¶ 46–47, 49–50. Officer Simpson, who had also just arrived, tried to stop Mr. Hinkley's resistance by holding his shoulders. *See* Dkt. No. 20-5 at 3:00–3:30; MSJ at 10 ¶ 46–47, 51. Officer McLelland may have struck Mr. Hinkley again with his baton, Resp. at 9, and one of the officers pressed the end of his baton into Mr. Hinkley's back to help pin him to the ground, Dkt. No. 20-5 at 3:20–3:30.[3]

---

[2] Indeed, when confronted with the video evidence at the hearing, Mr. Hinkley's counsel backed away from the assertion that Mr. Hinkley was "subdued" before the Defendant Officers put Mr. Hinkley into the second handcuff and acknowledged that Mr. Hinkley was still "struggling" with the Defendant Officers at this time. Hearing at 51:25–52:10.

[3] According to Mr. Hinkley, "when [he] was pinned to the ground, Officer McClelland [sic] used his baton to strike [him]." Resp. at 9. Although the video evidence shows that one of the officers (it is not clear which) pressed his baton against Mr. Hinkley's back to help hold him to the ground, it is quite clear that Mr. Hinkley was not struck with a baton once he was pinned to the ground. It is possible that Mr. Hinkley's statement refers to the officer's use of the baton to

4

After an extended struggle, the officers were able to get the right handcuff on Mr. Hinkley by holding him to the ground on his stomach and forcing his arms behind his back. *See* MSJ at 10–11 ¶ 52; Resp. at 11–12; Dkt. No. 20-5 at 3:00–3:45.

After securing the right handcuff, Officers Silva and McLelland asked Mr. Hinkley if he was "done fighting" and warned him that he would be taken back to the ground "if he did anything stupid." MSJ at 11 ¶ 56. Officers Silva and McLelland then brought Mr. Hinkley to his feet and demanded that he give up his brass knuckles. *See id.* at 11 ¶¶ 58–59. But, as the video clearly shows, Mr. Hinkley resisted the officers' attempts to remove the brass knuckles by twisting his upper body. *See* Dkt. No. 20-5 at 5:10–5:40; Dkt. No. 30-45; *compare* MSJ at 11–12 ¶ 60, *with* Resp. at 14. Officer McLelland responded by tackling Mr. Hinkley back to the ground. *See* Dkt. No. 20-5 at 5:10–5:40. The other officers on scene, including Officer Pearce, who had arrived while Mr. Hinkley was on the ground and in handcuffs, gathered around Mr. Hinkley to help restrain him as he twisted his body and kicked his legs. *See* Dkt. No. 20-5 at 5:20–5:40; Dkt. No. 30-46; Dkt. No. 30-47; MSJ at 12 ¶ 62. While trying to pin Mr. Hinkley to the ground, one of the officers pushed snow into Mr. Hinkley's face; Mr. Hinkley turned his head to the other side. *See* Dkt. No. 20-5 at 5:40–6:20. Officer Smith retrieved a rip hobble to restrain Mr. Hinkley's legs and assisted in putting it on Mr. Hinkley while the other officers kept Mr. Hinkley pinned to the ground. MSJ at 13 ¶ 70.[4] After placing Mr. Hinkley in the rip hobble, the officers

---

help hold him to the ground. It is also possible that Officer McLelland struck Mr. Hinkley with his baton again during the preceding struggle—although the video evidence does not show such a strike, it also does not definitively rule out the possibility that it occurred.

[4] Mr. Hinkley's complaint can be read to assert that "one or more of the Defendant Officers continued to beat Mr. Hinkley" while he was pinned to the ground and the officers were waiting to apply the rip hobble to restrain his legs. *See* Compl. at 9 ¶ 38. If read in this way, Plaintiffs' allegation would conflict with the video evidence. During the hearing, Mr. Hinkley's counsel clarified that this assertion refers to the officers' efforts to handcuff Mr. Hinkley rather than to their application of the rip hobble. Hearing at 50:30–50:55.

carried Mr. Hinkley out of the snow, placed him on his side on the sidewalk, and waited around him for medical personnel to arrive. *See* Dkt. No. 20-5 at 6:00–15:30. Mr. Hinkley alleges that he suffered "three broken ribs and injuries to the soft tissues in his chest, soft tissue hematoma on his right forehead/scalp for which he received seven staples, a fracture to his right rib, a fracture to his hand, nasal bone fractures, a serious injury to his spine, a concussion, and . . . lacerations and bruising" as a result of the officers' various actions. Resp. at 19.

Mr. Hinkley was charged with three counts of assault on a police officer—including one felony count—one count of burglary, and counts relating to failing to comply with an officer, interfering with arrest, and intoxication. *See* MSJ at 13–14 ¶ 75. Mr. Hinkley entered a guilty plea to two counts of misdemeanor assault on a police officer and the other counts were dropped. *See id.* at 14 ¶ 76. Mr. Hinkley subsequently brought this suit and Defendants moved for summary judgment.

## II.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[C]ourts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion." *Scott*, 550 U.S. at 378 (citations, internal quotation marks, and brackets omitted).

"In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts." *Id.* But uncontroverted video evidence can limit such wholesale deference to the

plaintiff. *Id.* at 379–81. Because "facts must be viewed in the light most favorable to the nonmoving party *only if* there is a 'genuine' dispute as to those facts," the court may use such video evidence to determine whether there is a genuine dispute. *Id.* (emphasis added). In *Scott*, for example, the Supreme Court reversed a lower court for relying on a plaintiff's version of the facts that was "so utterly discredited by the record that no reasonable jury could have believed him." *Id.* The Court held that the lower court "should not have relied on such visible fiction." *Id.* Instead, "it should have viewed the facts in the light depicted by the videotape." *Id.*

But the existence of video evidence does not mean that courts should completely ignore the plaintiff's version of the facts. Courts should only reject a plaintiff's statement of the facts when that statement is "blatantly contradicted" by the video evidence. *See York v. City of Las Cruces*, 523 F.3d 1205, 1210 (10th Cir. 2008). Thus, for example, facts alleged by the plaintiff that are outside of what can be determined by the video still must be taken as true. *See Ross v. Burlington Northern*, 528 F. App'x 960, 963–65 (10th Cir. 2013).

### III.

The court first addresses the argument that the individual Defendants are entitled to qualified immunity. "In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry." *Tolan v. Cotton*, 572 U.S. 650, 655 (2014). "The first asks whether the facts, taken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a federal right." *Id.* at 655–56 (citation, quotation marks, and brackets omitted). "The second . . . asks whether the right in question was clearly established at the time of the violation." *Id.* at 656 (quotation marks omitted). As explained below, the court holds that the officers in this case are entitled to qualified immunity because their conduct did not violate Mr. Hinkley's Fourth Amendment rights—let alone any right that was clearly established.

7

**A.**

The Fourth Amendment guarantees the "right of the people . . . against unreasonable . . . seizures." U.S. CONST. amend. IV. The Supreme Court has made clear that an arrest is a seizure within the meaning of this Amendment. *See Graham v. Connor*, 490 U.S. 386, 394–95 (1989). As the adjective "unreasonable" suggests, this Amendment does not prohibit law enforcement officers from using any force in connection with an arrest; to the contrary, the "right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* at 396. The Fourth Amendment does, however, prohibit "excessive force during an investigation or arrest." *Tolan*, 572 U.S. at 656; *see also Graham*, 490 U.S. at 395–96.

Mr. Hinkley argues that the officers in this case employed excessive force in effectuating his arrest and thus violated the Fourth Amendment. Given the difficulty and danger posed by Mr. Hinkley's resistance, the court rejects this contention.[5]

**1.**

"Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (citations and quotation marks omitted). This inquiry "requires careful attention to the facts and circumstances of each particular case, including the severity of

---

[5] Plaintiff repeatedly argues that "in the context of a motion for summary judgment, the issue whether a police officer used excessive force is generally considered to be a fact question best answered by the jury." Resp. at 25. But this is not true "where there are no disputed questions of historical fact." *Cavanaugh v. Woods Cross City*, 718 F.3d 1244, 1254 (10th Cir. 2013) (citing *Scott*, 550 U.S. at 386). Absent such a dispute, it is proper for the court to "make the excessive force determination on its own." *Id.*

the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* But "the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." *Id.* (citation and brackets omitted). Rather, whether the use of force complies with the Fourth Amendment turns on the "totality of the circumstances." *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985); *see also Graham*, 490 U.S. at 396 (citing *Garner* for this proposition after outlining the three considerations quoted above); *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1318 (10th Cir. 2009) ("It is the totality of the circumstances that is the touchstone of the reasonableness inquiry."). Ultimately "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397.

In *Graham*, the Supreme Court also emphasized that "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. Drawing from Fourth Amendment decisions in other contexts, the Court explained:

> With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Id.* at 396–97 (internal citations and quotation marks omitted). "If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed." *Saucier v. Katz*, 533 U.S. 194, 205 (2001).

## 2.

In this case, the court has little difficulty concluding that the individual Defendants' actions were "'objectively reasonable' in light of the facts and circumstances confronting them." *Graham*, 490 U.S. at 397. The officers sought to arrest Mr. Hinkley for a serious crime—burglary—and Mr. Hinkley's aggressive response to the officers provided additional serious grounds for arrest. Indeed, Mr. Hinkley ultimately "entered a guilty plea to two counts of misdemeanor assault against a police officer in exchange for dismissal of [a] felony assault charge, burglary charge, and other counts." MSJ at 14 ¶ 76.

In addition, as evidenced not only by Mr. Hinkley's guilty plea, but also by the video evidence, Mr. Hinkley plainly posed an "immediate threat to the safety of the officers." *Graham*, 490 U.S. at 396. Not only did Mr. Hinkley repeatedly seek to hit and kick the officers with his arms and legs, he also made multiple attempts to strike the officers with the brass knuckles he was wearing—an indisputably dangerous weapon.

Finally, the video evidence makes clear that Mr. Hinkley responded to the officers' attempts to arrest him by first "attempting to evade arrest by flight," and by aggressively and "actively resisting arrest" throughout the encounter. *Id*. At the outset of the encounter, Mr. Hinkley tried to strike Officer Leong multiple times, attempted to flee, wrestled with the officers, and strenuously resisted handcuffing. Even after he was handcuffed, Mr. Hinkley resisted the removal of his brass knuckles by twisting his body and, after being taken to the ground again, resisted the officers' attempts to control him by kicking his legs and contorting his body.

The court has found no authority suggesting—nor is it inclined to hold—that officers facing circumstances such as these may not use force of the type and degree

employed here.[6] To the contrary, the court concludes that when attempting to arrest an individual suspected of a serious crime who is armed with a dangerous weapon and resists arrest and attempts to flee by fighting the officer with the weapon as well as his arms and feet, officers may use force of the type applied here. *Cf., e.g.*, *Hinton v. City of Elwood*, 997 F.2d 774, 781 (tackling and using a stun gun against a misdemeanant who shoved and tried to bite police officers was reasonable); *Weigel v. Broad*, 544 F.3d 1143, 1152–53, 1155 (10th Cir. 2008) (refusing to hold unreasonable defendants' tackling, choking, handcuffing, and binding of plaintiff's feet after plaintiff collided with defendants' police car and walked away from a sobriety test and before plaintiff was resultingly subdued); *McCoy v. Meyers*, 887 F.3d 1034, 1048–49 (10th Cir. 2018) (striking and applying carotid restraint to a suspect who reasonably appeared to be reaching for a gun was not clearly unconstitutional). The court further concludes that officers facing such circumstances may continue to use such force until the suspect is disarmed and his arms and legs are restrained—or at least until the suspect has clearly submitted and ceased his resistance. *Cf. Weigel*, 544 F.3d at 1154. Here the video evidence makes clear that that never happened—Mr. Hinkley continued to resist until his arms and legs were restrained, or at least his actions would have been perceived as continuous resistance by a reasonable officer. *Cf. McCoy*, 887 F.3d at 1048.

---

[6] This includes conduct such as wrestling Mr. Hinkley to the ground, using tasers in attempt to stop Mr. Hinkley's flight and to compel his compliance, hitting Mr. Hinkley's arm and back in the course of the struggle to handcuff him, shoving snow into Mr. Hinkley's face, throwing Mr. Hinkley back to the ground when he continued to resist the officers' demands, pinning him to the ground, and rip hobbling him to secure his legs. *See Graham*, 490 U.S. at 396 ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment.") (internal citation and quotation marks omitted).

**3.**

Relying on Tenth Circuit precedent stating that courts must "analyze the *Graham* factors 'at the precise moment that the officer used force,'" Mr. Hinkley argues—and Defendants appear to agree—that this court should "carve up the incident into segments and judge each on its own terms to see if the officer was reasonable at each stage." Resp. at 23–24 (quoting *Estate of Ronquillo v. Denver*, 720 F. App'x 434, 438 (10th Cir. 2017), and *Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir. 1996) (citation omitted)); *see also* Dkt. No. 30 ("Reply") at 9.[7] Accordingly, Mr. Hinkley argues, this court must begin its analysis by dividing the incident at issue here into three "segments"—first, the events that transpired up to the point that the officers succeeded in handcuffing Mr. Hinkley's left arm; second, the events that transpired from this point until the officers succeeded in handcuffing Mr. Hinkley's right arm; and, finally, the events that transpired after that point. *See, e.g.*, Resp. at 23–24. This court must then, Mr. Hinkley argues, separately consider whether the individual Defendants' use of force was justified during each segment without regard to the events that occurred during the other segments. *Id.*

Mr. Hinkley does not challenge the force employed by the officers in handcuffing his left arm, *see* Hearing at 1:30–2:05, and he now concedes that some degree of force may have been justified up to the point that the officers succeeded in handcuffing his right arm, *see id*. at 51:25–52:10.[8] Mr. Hinkley insists, however, that any use of force that occurred after he was handcuffed

---

[7] The Tenth Circuit has used the same or similar language in other cases as well. *See, e.g.*, *Pauly v. White*, 874 F.3d 1197, 1220 (10th Cir. 2017); *Medina v. Cram*, 252 F.3d 1124, 1132 (10th Cir. 2001); *Sevier v. City of Lawrence*, 60 F.3d 695, 699 (10th Cir. 1995).

[8] In his brief, Mr. Hinkley initially maintained that any force employed during the second stage was unreasonable because he was effectively subdued once the first handcuff was secured. *See, e.g.*, Resp. at 2–4. At the hearing, however, his lawyer conceded that some force may have been justified during the second stage, though he maintained that the degree of force employed during this stage was excessive. Hearing at 51:25–52:10.

cannot be justified by anything that occurred before this point and was unreasonable in light of the circumstances presented during this third "segment."

The Tenth Circuit's statements that the use of force must be analyzed "at the precise moment that the officer used force" do appear to provide at least some support for Mr. Hinkley's position. If these statements were to be read and applied in the inflexible manner urged by Mr. Hinkley, however, the court believes that they would be very difficult to square with the Supreme Court's decision in *Graham* and other Supreme Court precedents. To be sure, at first blush these statements seem to echo the Supreme Court's admonition in *Graham* that "[w]ith respect to a claim of excessive force, the same standard of reasonableness *at the moment* applies . . . ." 490 U.S. at 396 (emphasis added). In *Graham*, however, the Court used this language not to distinguish one portion of an arrest from another, but rather to distinguish "the perspective of a reasonable officer on the scene" from "the 20/20 vision of hindsight." *Id*. at 396–97. Indeed, the Court immediately followed its statement that the "standard of reasonableness at the moment applies" with a colon and the following language:

> Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Id.* (internal citation and quotation marks omitted). Dividing "tense, uncertain, and rapidly evolving" circumstances into separate segments for a hermetically sealed, segment-by-segment analysis in the manner proposed by Mr. Hinkley smacks of the "20/20 . . . hindsight" analysis "in the peace of a judge's chambers" barred by *Graham*. If read as Mr. Hinkley insists, the Tenth Circuit's admonition that the use of force must be analyzed "at the precise moment that the officer used force" would thus turn the analysis prescribed by the Supreme Court on its head.

13

Evaluating the reasonableness of an officer's use of force with reference to only one "segment" of an incident would also necessarily contradict the Supreme Court's mandate to consider the "*totality* of the circumstances." *Garner*, 471 U.S. at 8–9 (emphasis added); *accord Graham*, 490 U.S. at 396. Indeed, in other Fourth Amendment contexts, the Supreme Court has expressly indicated that "[t]he totality-of-the-circumstances test 'precludes this sort of divide-and-conquer analysis.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 588 (2018) (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002)). It is difficult to imagine any reason why a different rule would apply in this analogous context. *Cf. Mason v. Lafayette City-Parish Consol. Gov.*, 806 F.3d 268, 285–86 (5th Cir. 2015) (Higginbotham, J., dissenting in part) ("I am at sea as to why the majority slices a single event into distinct segments . . . . Nowhere in its opinion does the majority explain from where it derives the authority to slice a single event . . . ."); *Weigel*, 544 F.3d at 1161 (O'Brien, J., dissenting) ("The district court segmented this case into two discrete events . . . . It then analyzed each segment separately. The majority does the same. But segmentation of facts and analysis is a form of 'divide and conquer' decried in *United States v. Arvizu*, 534 U.S. 266, 274 (2002) . . . .").

Fortunately, the Tenth Circuit's precedents need not be read or applied in the inflexible manner urged by Mr. Hinkley. Emphasizing that "[i]t is the totality of the circumstances that is the touchstone of the reasonableness inquiry," the Tenth Circuit has indicated that "'[s]trict reliance' on the 'precise moment' factor is inappropriate when the totality must be considered." *Thomson*, 584 F.3d at 1318 (rejecting the argument that the defendant "acted unreasonably in shooting" a suspect and declining to consider only the circumstances present "immediately before [the defendant] fired the fatal shot"). In *Phillips v. James*, for example, the Tenth Circuit rejected the plaintiffs' attempt to "rel[y] heavily on the 'precise moment' factor" to argue that the

defendant "was not in danger of serious bodily injury *immediately prior* to the time when he shot" one of the plaintiffs. 422 F.3d 1075, 1083 (10th Cir. 2005) (emphasis added). Instead, considering "the totality of the circumstances," the Tenth Circuit held that even if the circumstances present at "the precise moment" before the shot were "a critical factor," "the events leading up to that moment" were also "extremely relevant." *Id.* Indeed, even in *Sevier v. City of Lawrence*, the Tenth Circuit case that appears to have first invoked the "precise moment" language, the court recognized that the reasonableness of an officer's use of force turns not only on the circumstances present "at the precise moment," but also on "events immediately connected with the actual seizure." 60 F.3d 695, 699 (10th Cir. 1995) (quoting *Bella v. Chamberlain*, 24 F.3d 1251, 1256 & n.7 (10th Cir. 1994)).

**4.**

Even if this court were to follow Mr. Hinkley's preferred analysis and divide the totality of the circumstances of his arrest into three segments, it would still not find a constitutional violation. As noted above, Mr. Hinkley does not challenge the officers' use of force up until the point that his left arm was handcuffed. And given the serious nature of the crime for which the officers sought to arrest Mr. Hinkley, Mr. Hinkley's attempted flight, and his repeated assaults on the officer—including his multiple attempts to strike Officer Leong with his brass knuckles— the court believes that Mr. Hinkley's reticence regarding the first "segment" is well taken.

With respect to the second "segment"—which began when the officers handcuffed Mr. Hinkley's left arm and ended when they handcuffed his right arm—Mr. Hinkley concedes that some force was permissible but contends that the actual force applied was excessive. But during this period the officers still sought to arrest Mr. Hinkley for the serious crime of burglary and now had reason to arrest him for assaulting Officer Leong, failing to comply with an officer, and

15

interfering with an arrest as well. In addition, the video evidence makes clear that Mr. Hinkley continued to struggle against the officers to resist arrest. Finally, there can be little doubt that Mr. Hinkley continued to pose a significant danger to the officers: it was his right hand, after all—which had not yet been handcuffed—that was armed with the brass knuckles.

To be sure, the danger posed by Mr. Hinkley was significantly reduced once his right arm was secured into the handcuffs—the point at which the third "segment" began. The danger may not have been entirely eliminated, however, given Mr. Hinkley's apparent attempts to kick at the officers once he was taken to the ground. Regardless, the other considerations outlined in *Graham*—the seriousness of the offenses for which the officers now had cause to arrest Mr. Hinkley and his ongoing resistance—continued to justify at least some degree of force. Furthermore, the degree of force employed by the officers after they had completed handcuffing Mr. Hinkley was much lower than during the earlier "segments" of the arrest. Officer McLelland threw Mr. Hinkley down to restrain him when he resisted the officers' attempts to remove his brass knuckles. The other officers helped pin Mr. Hinkley down to prevent him from kicking and flailing. And although one officer did shove snow in his face at this point, this action did not prevent Mr. Hinkley from moving his head to the other side to continue to breath. *See Graham*, 490 U.S. at 396–97 (noting that "in circumstances that are tense, uncertain, and rapidly evolving," "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers violates the Fourth Amendment.") (internal citation and quotation marks omitted). In light of the circumstances present during the third "segment," the court concludes that the much-reduced force employed by the officers during this segment was not unreasonable.

**B.**

Even if Mr. Hinkley were correct that the force employed by the individual Defendants violated his Fourth Amendment rights, it did not violate any right that was clearly established. "Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (citations and internal quotation marks omitted). Accordingly, the alleged violation must "have a sufficiently clear foundation in then-existing precedent" either from "controlling authority" or "a robust consensus of cases of persuasive authority." *Id.* at 589–90 (citations and internal quotation marks omitted).

"The 'clearly established' standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him." *Id.* at 590. Apart from the "rare obvious case, where the lawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances," a plaintiff seeking to overcome qualified immunity generally must "identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." *Id.* (citations and internal quotation marks omitted). "While there does not have to be a case directly on point, exiting precedent must place the lawfulness of the particular arrest beyond debate." *Id.* (citation and internal quotation marks omitted).

As noted above, neither the parties nor this court has found even a single authoritative case holding that when attempting to arrest an individual suspected of a serious crime who is armed with a dangerous weapon and resists arrest and attempts to flee by fighting the officer with the weapon as well as his arms and feet, law enforcement officers may not use force of the type that was employed in this case. To the contrary, to the extent the case law addresses similar

uses of force in similar contexts, it holds such force to be constitutional. *See, e.g.*, *Hinton*, 997 F.2d at 781; *Weigel*, 544 F.3d at 1152–53, 1155; *McCoy*, 887 F.3d at 1048–49. Nor have the parties or this court identified any authoritative case holding that officers facing such circumstances may not continue to use such force until the suspect is disarmed and his arms and legs are restrained—or at least until the suspect has clearly submitted and ceased his resistance.

Mr. Hinkley relies on cases like *Perea v. Baca*, 817 F.3d 1198 (10th Cir. 2016), to argue that officers' use of force was unconstitutional. But this is a mistake. Even assuming that *Perea* clearly establishes anything in the very different factual context of Mr. Hinkley's arrest, that case held only that "it is [] clearly established that officers may not continue to use force against a suspect who is effectively subdued." *Id.* at 1204. Mr. Hinkley, however, was not subdued at any point at which the officers employed force against him. The video evidence makes clear that even after the officers handcuffed his left arm (the point at which Mr. Hinkley begins to challenge the force employed against him), Mr. Hinkley continued to resist their demands, contorting his body to make it difficult to handcuff his right arm and remove his brass knuckles, and kicking and struggling until his legs were restrained. And even if Mr. Hinkley believed he was subdued—or was in fact subdued, as he maintains—an officer viewing Mr. Hinkley's actions could have reasonably believed otherwise. *Cf. McCoy*, 887 F.3d at 1048.

## IV.

It is well settled that "[a] municipality may not be held liable [under § 1983] where there was no underlying constitutional violation by any of its officers." *Hinton*, 997 F.2d at 782 (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)). Because the individual Defendants' use of force did not violate the Fourth Amendment, Defendant Salt Lake City Corporation cannot be held liable under § 1983.

\* \* \*

For the foregoing reasons, the court **GRANTS** Defendants' motion for summary judgment. **IT IS SO ORDERED.**

DATED this 5th day of December, 2019.

BY THE COURT:

_____
Howard C. Nielson, Jr.
United States District Judge